## RULE et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 2458.

Circuit Court of Appeals, Tenth Circuit.
April 30, 1942.

Robert C. Foulston and John F. Eberhardt, both of Wichita, Kan. (George Siefkin, Samuel E. Bartlett, Lester L. Morris, George B. Powers, Carl T. Smith, and C. H. Morris, all of Wichita, Kan., on the brief), for petitioners.

Harry Marselli, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

This is a petition to review a decision of the Board of Tax Appeals.

The Golden Rule Oil Company,[1] a corporation organized under the laws of Kansas, was engaged in the operation of a chain of filling stations. It had an authorized and outstanding capital stock of 4,500 shares of the par value of $100 per share. Elbert S. Rule was its president and majority stockholder. In 1936, he turned into the corporation 1,530 shares which the corporation thereafter held as treasury stock until it was retired in February, 1938. He retained 1,820 shares represented by certificates, each of which was identifiable by number, date purchased, and cost. The date acquired, the certificate number, the number of shares in each certificate, and the cost to Rule of the stock in each of such certificates, as found by the Board, are set forth in the appended note 2.[2]

---

[1] Hereinafter called the corporation.

| [2] Date Acquired | Certificate Number | Number of Shares | Cost |
|---|---|---|---|
| 11-12-1917 | 17 | 300 | $ 5,000.00 |
| 4-22-1921 | 11 | 300 | 10,000.00 |
| 4-22-1921 | 13 | 300 | 10,000.00 |
| 1- 5-1922 | 37 | 50 | 2,500.00 |
| 1- 5-1922 | 38 | 100 | 5,000.00 |
| 1- 5-1922 | 39 | 100 | 5,000.00 |
| 4- 1-1925 | 15 | 60 | 4,000.00 |
| 12-31-1929 | 9 | 210 | 23,555.00 |
| 2- 1-1931 | 30 | 10 | 897.33 |
| 2- 1-1931 | 32 | 150 | 15,825.00 |
| 2-14-1933 | 34 | 160 | 17,946.66 |
| 4-14-1933 | 35 | 20 | 2,243.33 |
| 2- 2-1935 | 24 | 60 | 3,200.00 |
| | | 1,820 | $105,167.32 |

In 1937, the corporation sold 26 of its filling stations for $117,500. The details of the sale were handled by Roy E. Stewart, secretary-treasurer and general manager of the corporation. Before and after the consummation of the sale, Rule consulted attorneys and tax accountants concerning the method to be followed in distributing the major portion of the sale proceeds to stockholders. He was advised to effect a distribution by a reduction of the capital stock of the corporation. Accordingly, notice was sent to stockholders of a special meeting to be held October 30, 1937. At the special meeting held pursuant to the notice, a resolution was duly adopted to cancel the 1,530 treasury shares, thereby reducing the capitalization to 2,970 shares, and to further cancel 891 shares, thereby reducing the capitalization to 2,079 shares, and to distribute to the stockholders for stock surrender on the basis of $123.45 per share, $110,000 of the proceeds of the sale. Thus, the corporation by proper action provided for the cancellation of 546 shares of the 1,820 shares held by Rule and the payment to him therefor of $123.45 per share, or $67,403.70. Before any shares were canceled, Rule obtained the advice of attorneys and tax accountants as to the best method of surrendering his stock from the viewpoint of tax liability. He was advised that he had the right to cancel the highest cost shares, thereby reducing his capital gain. Thereupon, Rule requested Stewart, who was thoroughly familiar with Rule's books and records, to prepare a summary showing the amounts, dates of purchase, certificate numbers, and cost of his stock holdings in the corporation. Stewart prepared the summary. A like summary was prepared by Rule's tax accountants. Each summary indicated that Rule's highest cost shares were represented by certificates 9 for 210 shares, 32 for 150 shares, 34 for 160 shares, and 35 for 20 shares, or a total of 540 shares of the 546 to be canceled. On the summary, Stewart indicated the highest cost shares by placing a circle around the certificate number of certificates 9, 32, 34, and 35. The accountants

on their summary identified the same certificates by check marks. Thereafter, and before he turned in his certificates for cancellation, Rule received from the corporation $67,403.70. Stewart requested each of the stockholders to turn in all of his certificates in order that Stewart might issue new certificates for the 70 per cent of the stock not to be canceled, showing on their face the reduction in capitalization from $450,000 to $207,900 par value, and cancel the remaining certificates. Rule delivered to Stewart the 13 certificates representing the 1,820 shares held by him. At the time of the delivery of such certificates to Stewart, Rule stated to Stewart that he desired to cancel the certificates representing the highest cost stock. Stewart had made the summary and knew that Rule referred to certificates 9, 32, 34, and 35 and understood at the time of the delivery of the certificates that certificates numbered 9, 32, 34, and 35 were to be canceled and that the remaining six shares to be canceled were to be taken from any certificates he chose.[3]

Stewart pasted all 13 certificates to the corresponding stubs in the stock certificate book and issued to Rule a new certificate for 1,274 shares. Stewart testified that in so doing, he intended to cancel the shares formerly represented by certificates 9, 32, 34, and 35 and six other shares and to incorporate the balance of Rule's 1,274 shares into a new certificate. On the stubs of certificates 9, 32, 34, and 35, Stewart placed a check mark as a symbol to indicate that those certificates had been canceled.

Thereafter, a Mr. Gardner, who had been recommended to Rule, was employed by Rule to prepare his 1937 income tax return. Gardner was not the accountant or attorney with whom Rule and Stewart had consulted prior to and during the stock liquidation transaction. Gardner made out a tax return that is both incorrect and unintelligible. It does not truly reflect a cancellation of the specific certificates 9, 32, 34, and 35, nor a cancellation under the first-in, first-out rule. Gardner told Rule that the return showed no tax liability.

[3] On this particular issue the Board found:

"Certificates numbered 9, 32, 34 and 35 had the largest cost basis. At the time petitioner surrendered his certificates to the secretary for cancellation he informed him that he 'wanted to retire such certificates there that cost me the most money.' The secretary had access to petitioner's books of account, stock certificates, records, etc. aided him in keeping his books of account, was familiar with the cost basis of the shares and knew which had the highest cost basis. The aggregate number of shares contained in the four certificates numbered 9, 32, 34 and 35 was 540."

Rule placed complete reliance in Gardner and, believing he had made a proper return, signed the return without examining it or knowing what it reflected.

On July 7, 1939, the Commissioner sent Rule a deficiency notice proposing a deficiency of $5,519.24 in Rule's 1937 tax, treating the 546 shares surrendered by Rule as unidentifiable and applying the first-in, first-out rule. Rule filed a petition to review the decision of the Commissioner with the Board of Tax Appeals. The Board sustained the deficiency proposed by the Commissioner.

The Board found that certificates 9, 32, 34, and 35 represented the highest cost stock held by Rule; that at the time Rule surrendered his certificates to Stewart for cancellation, Rule stated to Stewart that he desired to cancel the certificates representing the highest cost stock to him; and that Stewart knew the certificates which represented the highest cost stock to Rule. Because Stewart did not specifically indicate on the corporate records that certificates 9, 32, 34, and 35 were canceled and did not recite that the new certificate was issued to take the place of certificates other than 9, 32, 34, and 35, less six shares, the Board concluded that no identifiable certificates were canceled.

Prior to the surrender of the certificates and disbursement of the money, Stewart knew that certificates 9, 32, 34, and 35 represented the highest cost stock to Rule, and that Rule desired to cancel such certificates. When Rule delivered his certificates to Stewart, Rule stated that he desired to surrender for cancellation the certificates representing the highest cost stock to him. Stewart then knew that certificates 9, 32, 34, and 35 represented the highest cost stock to Rule and understood that Rule desired to surrender those certificates for cancellation. The minds of Stewart, acting as an officer of the corporation, and Rule clearly met upon an understanding that certificates 9, 32, 34, and 35 were surrendered for cancellation. Rule had received a distribution of the proceeds of the sale for such certificates. The transaction was consummated when the certificates were delivered by Rule to Stewart with the understanding that certificates 9, 32, 34, and 35 were to be canceled.

Registration of a transfer of shares on the books of the corporation is not necessary to the validity of the transfer. Even where the charter or by-laws of a corporation, or the general law under which it is organized, provide that stock shall be transferable only on the books of the corporation, it is well settled that as between the parties, an unregistered transfer is valid.[4]

Moreover, the corporate records tend to confirm the transaction. Stewart indicated the surrender and cancellation of certificates 9, 32, 34, and 35 by check marks. This was his method of reflecting the transaction on the corporation records. That symbol to him meant surrender and cancellation.

Identification is not limited to designation by number of certificate. Any designation which specifically identifies the stock to be transferred is sufficient.[5]

We conclude that under the undisputed facts and the findings of the Board, the first-in, first-out rule was not applicable.

Reversed and remanded for further proceedings in accordance with this opinion.

4 Fletcher Cyc. Corporations, Perm.Ed., Vol. 12, §§ 5489, 5496; Plumb v. Bank of Enterprise, 48 Kan. 484, 29 P. 699, 700; Culp v. Mulvane, 66 Kan. 143, 71 P. 273, 276; Dewey v. Barnhouse, 83 Kan. 12, 109 P. 1081, 1083, 1084, 29 L.R.A.,N.S., 166; Johnston v. Laflin, 103 U.S. 800, 804, 26 L.Ed. 532.

5 In Helvering v. Rankin, 295 U.S. 123, 128, 55 S.Ct. 732, 735, 79 L.Ed. 1343, the court said:

"The fallacy of this argument lies in the assumption that shares of stock can be identified only through stock certificates. It is true that certificates provide the ordinary means of identification. But it is not true that they are the only possible means. Compare Richardson v. Shaw, 209 U.S. 365, 28 S.Ct. 512, 52 L.Ed. 835, 14 Ann.Cas. 981; Gorman v. Littlefield, 229 U.S. 19, 33 S.Ct. 690, 57 L.Ed. 1047; Duel v. Hollins, 241 U.S. 523, 36 S.Ct. 615, 60 L.Ed. 1143. * * * The required identification is satisfied, if the margin trader has, through his broker, designated the securities to be sold as those purchased on a particular date and at a particular price. It is only when such a designation was not made at the time of the sale, or is not shown, that the 'First-in, first-out' rule is to be applied."

In Miller v. Commissioner, 2 Cir., 80 F.2d 219, 221, the court said:

" * * * the 'First in First out' rule applies only where there is neither identification by a certificate, nor by designation of the taxpayer."