No. 42,101

ROBERT F. HUDSON, Administrator of the Estate of Charles B. Hudson, Deceased, *Appellant*, v. MRS. E. S. TUCKER, *Appellee*.

(361 P. 2d 878)

Opinion filed May 13, 1961.

L. M. Kagey, of Wichita, argued the cause, and David W. Kester, of Eureka, was with him on the briefs for the appellant.

George Forbes, of Eureka, argued the cause, and Thos. C. Forbes and Harold G. Forbes, both of Eureka, were with him on the briefs for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is a replevin action by the administrator of an estate to recover certain personal property held by the defendant, a stepdaughter of the decedent. Defense was based upon the ground that the decedent had given the property to the defendant before his death. Judgment was entered in favor of the defendant by the district court upon the general verdict of the jury, and appeal has been duly perfected by the administrator raising the questions hereinafter discussed.

The substantive question presented is whether the defendant's evidence is sufficient to establish an inter vivos gift. A procedural question is also presented as to whether the district court was the proper forum in which to determine the issues raised by the pleadings.

The facts giving rise to this controversy are as follows: In September, 1909, Charles B. Hudson married the defendant's mother, Gertrude. At that time the defendant was eight years of age, and she also had an older sister, Erma. Charles B. Hudson, his wife, Gertrude, and the two girls resided together as a family in Wichita,

Kansas, until the defendant and her sister each married and established homes of their own. The defendant married E. S. Tucker in August, 1929, and has resided in Eureka, Kansas, since that time. Erma has lived in California for many years.

Charles B. Hudson was an attorney and practiced law in the City of Wichita for many years. He and his wife, Gertrude, resided together in a very close relationship for forty-six years until her death in 1955. There is testimony in the record that the relationship between them was perfect and they were very devoted to each other. Charles B. Hudson died the evening of May 29 or early morning of May 30, 1959.

The defendant's natural father died soon after her birth and the defendant knew no father other than Charles B. Hudson. She thought of him as her father and so referred to him in her testimony. Charles B. Hudson had no other marriages and no children of his own. He raised the two daughters of his wife, Gertrude, as his own children, and always referred to them as "his daughters" but never legally adopted them. According to the testimony of witnesses the same relationship existed between Charles B. Hudson and the defendant as between a natural father and daughter. After the defendant's marriage and establishment of a home in Eureka, the defendant continued her close contact with her stepfather and her mother until the time of the death of each of them. After Gertrude's death, Charles B. Hudson received even greater comfort from his close relationship with the defendant. His letters to the defendant were quite affectionate and devoted.

The record discloses that Charles B. Hudson did not have much property in 1915, but he and his wife, Gertrude, jointly accumulated property during their marriage, consisting of suburban real property near Wichita, savings accounts in two separate building and loan institutions, a bank account, government bonds, corporate stocks, and an insurance policy insuring the life of Charles B. Hudson. The bonds, insurance policy and corporate stocks are alleged in the plaintiff's petition to be in the possession of the defendant. (After this action was instituted the insurance policy was surrendered to the insurance company, but the proceeds of such policy remain a matter in controversy.) The value of the reported assets of the decedent *not here in controversy* was approximately $26,000. The value of the assets in the defendant's possession was alleged by the plaintiff to be $24,326.

Shortly after Gertrude died on September 5, 1955, Charles B. Hudson expressed his intention to dispose of all his property so that he would not need to make a will, and there is testimony that he was planning to make a gift to defendant. In the middle of August, 1956, the defendant and her husband were called on the telephone by Charles B. Hudson and asked to come to the City of Wichita to see him. They went to his office in the Schweiter Building, and *the government bonds, corporate stocks and the life insurance policy were given by Charles B. Hudson to the defendant.* In making the gift Charles B. Hudson expressly stated that he was giving these items to the defendant but retaining the interest, dividends or other income during his lifetime. The defendant accepted the insurance policy, stocks and bonds and placed them in her handbag.

The items delivered to the defendant consisted of 370 shares of Kansas Gas and Electric Company common stock, 106 shares of Kansas Power and Light Company common stock, $5,500 in Series "E" United States Savings Bonds, and an insurance policy with the Aetna Life Insurance Company for $5,000 payable to Mrs. Gertrude Hudson. At the time of this transaction Charles B. Hudson said these items were of the approximate total value of $30,000.

The defendant and her husband stayed that night in the home of Charles B. Hudson in Wichita, as was their custom when possible, and the gift was further discussed. Charles B. Hudson explained that all of the stocks and bonds stood in his name and Gertrude's jointly, and to facilitate the mailing out of the dividends on the various corporate stocks he was going to transfer them to his name alone so the dividend checks would be payable to him instead of to him and his wife as had previously been done. He also said he might want to transfer the government bonds, which had matured, into interest-bearing bonds, if he should need this income. The defendant said this was perfectly acceptable to her and she suggested that he keep all the securities for her. He could then make the changes desired, and in that manner she would not need to take them back and forth between Eureka and Wichita.

Charles B. Hudson agreed to keep the securities and said he would put them in a safety deposit box in the Fourth National Bank so she could get in the box at any time she wanted, and if anything happened to him she was to go to the box immediately and remove the contents. On the 16th day of October, 1956, the defendant was in Wichita during banking hours and she and Charles B. Hudson

went to the Fourth National Bank where the safety deposit box of Charles B. Hudson was changed. Both Charles B. Hudson and Mrs. E. S. Tucker signed a joint tenancy contract for the safety deposit box which contained a provision as follows:

". . . In the event of the death of a joint lessee, the survivors severally or sole survivor shall have access to said box and the right to remove all contents, . . ."

The defendant was given a key to the box. On the same date the checking account of Charles B. Hudson was changed into a joint tenancy account with the defendant.

Approximately ten days after the death of Charles B. Hudson the defendant, being unable to locate her key to the lock box, had it drilled open and removed the contents which is the subject of this litigation. The bank authorities were satisfied that the defendant had the right to have the box drilled open, and so far as they were concerned, to remove the contents as she had done.

The defendant removed from the safety deposit box 370 shares of Kansas Gas and Electric Company stock issued to Charles B. Hudson on March 7, 1957, representing stock which was formerly owned by Charles B. Hudson and Gertrude C. Hudson as joint tenants, and the certificates evidencing such ownership were endorsed to and transferred by Charles B. Hudson individually as the surviving joint tenant. She removed 106 shares of Kansas Power and Light Company stock issued to Charles B. Hudson on March 8, 1957, representing stock which was formerly owned by Charles B. Hudson and Gertrude C. Hudson as joint tenants, and the certificates evidencing such ownership were endorsed to and transferred by Charles B. Hudson individually as the surviving joint tenant. She removed $5,500 worth of government bonds. These were the same bonds which were given the defendant in the deceased's office in 1956. She also removed the insurance policy from the box. This was the same policy given to her in the deceased's office in 1956.

Charles B. Hudson was survived by only two heirs, his nephew, Robert F. Hudson, who was the adopted son of a deceased brother, Clyde Hudson, and a sister, Mrs. Edna Fisk, who resides in California. It is conceded the defendant, a stepdaughter of Charles B. Hudson, deceased, is not an heir.

Upon the death of Charles B. Hudson, Robert F. Hudson was appointed administrator and commenced proceedings in the pro-

bate court of Sedgwick County, Kansas, to determine what had been in the safety deposit box in the Fourth National Bank of Wichita. The defendant furnished the administrator and the probate court with a verified list of the contents of the box showing what securities were in the defendant's possession. Thereupon the administrator procured an order authorizing him to bring this replevin action against the defendant in the district court of Greenwood County, Kansas.

By appropriate allegations the administrator alleged in his petition that he was entitled to the immediate possession of the personal property described, and that it was wrongfully detained by the defendant. The defendant denied the plaintiff had any interest whatsoever in and to any of the personal property described, and alleged that at all times material she was and is the owner of said property and entitled to the possession thereof because Charles B. Hudson in the year 1956 had made a gift to her of the property in question, that "Said gift was made orally by a delivery of all of said items of personal property to defendant." The action was tried in March, 1960, before a jury which rendered a verdict for the defendant. Judgment was entered on the verdict and plaintiff's motion for a new trial was overruled, whereupon appeal was duly perfected to this court by the plaintiff-administrator. (Where necessary for clarity we shall refer to the parties as they appeared below.)

The appellant first challenges the jurisdiction of the district court to determine the issues raised by the pleadings. The issue to which the appellant makes reference is the defense set up in the answer, which the appellant contends is a claim against the estate of Charles B. Hudson, deceased. It is urged such claim must be filed in the probate court.

The appellant argues the admitted and undisputed facts show that the deceased, at the time of his death on or about May 31, 1959, was the record title owner of all the securities for which this action was instituted; that these securities in the Fourth National Bank of Wichita, Sedgwick County, Kansas, were in a safety deposit box held in joint tenancy by the deceased and the defendant; and that since the joint tenancy and survivorship was in the box only and not in the contents, the defense in this case constitutes a claim against the estate, and the district court is not the proper forum in which to present a claim against the estate of a deceased person.

Since the passage of the probate code in 1939, there have been

numerous cases discussing the respective jurisdictions of the probate and district courts in controversies concerning assets which may or may not be a part of the estate of a decedent. One of the most frequently quoted cases is *In re Estate of Thompson,* 164 Kan. 518, 190 P. 2d 879. There the cases were divided into two categories: *First,* those in which the plaintiff sought to get something out of the estate, and *second,* those wherein an administrator or executor sought to bring property of some sort into the assets of the estate, or otherwise to realize something of benefit to the estate. In cases of the first class, it has uniformly been held the probate court has exclusive original jurisdiction. In the second class it has been held the action was properly brought in the district court.

Our answer depends upon whether the administrator was attempting to bring something into the estate or, on the other hand, whether the defendant was attempting to get something out of the estate. It is true the defendant could have turned all of the securities in her possession over to the administrator and then filed a claim in the estate to get them back, but the pleadings reflect that the defendant already had the securities in her possession, under a claim of ownership since 1956, and was not attempting to get anything out of the estate. The plaintiff-administrator was seeking to get these securities into the estate—to have them declared assets of the estate and distributed along with the other assets of the decedent to the heirs, after the payment of administration expenses.

The trial court noted the importance of the administrator's action in the district court, which indicated a recognition on the part of the administrator that the property was not in the estate.

In the *Thompson* case the action was brought by the administrator in the district court to enforce a contract with the defendant. The defendant challenged the jurisdiction of the district court. The court there discussed the importance of the "moving party" as follows:

". . . Appellants [defendants] suggest, however, that if action to enforce a contract of this sort had been brought by them, the proper forum, under our decisions, would have been the probate court, and they argue that there is no logical reason why jurisdiction of the probate court should depend upon the question of who is the moving party. The argument may seem plausible but it ignores, we think, some very material considerations. In the first place, if appellants were bringing an action to enforce a¡ contract made with the decedent it would mean that they were seeking *to secure property constituting part of an estate* being administered. But in the case before us the action is to *bring property into the estate.* It is the very opposite of a demand upon an estate.

And of equal, if not of greater moment, is the fact that the code as construed requires that all demands upon the assets of the estate must be brought in the probate court while no such requirement is made as to actions by the personal representative of the estate to add to or to enhance the assets of the estate." (pp. 523, 524.)

In the *Thompson* case the action was held to be clearly within the second class and properly brought in the district court. While in that case, it is true, none of the property the executor sought to recover stood in the name of the decedent at the time of his death, this fact, as we shall presently see, is not a controlling factor in the instant case. In the *Thompson* opinion *Egnatic v. Wollard,* 156 Kan. 843, 137 P. 2d 188, relied upon by the appellant, was cited as being a case in which the plaintiff sought to get something out of the estate by attempting to enforce the terms of the contract.

*Malcolm v. Larson,* 158 Kan. 423, 148 P. 2d 291, relied upon by the appellant as being on all fours with the case at bar, is actually contrary to the appellant's contention. There the administrator brought an action in the district court to recover the value of certain property which was allegedly converted by the defendant. The defendant filed a cross petition in order to recover his undivided one-half interest in *other personal property* which had been allegedly owned by the defendant and the decedent together, *but sold by the administrator* without an accounting to the defendant. It was held the *cross demand* could not be entertained in the district court because it was in fact a claim against the estate and had to be prosecuted in the probate court which had jurisdiction of the subject matter. It was also held the allegations of the cross petition did not plead a pure defense.

The case of *In re Estate of Bourke,* 159 Kan. 553, 156 P. 2d 501, is distinguishable on the ground that the administrator of the estate *had possession* of a number of items of real and personal property standing in the name of the decedent. It was held that another party, who claimed to have an interest in such property as a partner of the decedent, must necessarily file a claim in the probate court in order to get those assets out of the estate.

A case similar to the instant action on the point presently under consideration is *Coffey v. Shrope,* 180 Kan. 621, 306 P. 2d 164. There an administrator brought an action in the district court to recover, in addition to other property, United States savings bonds, cash on hand in a checking account, and proceeds of the sale of wheat, which it alleged were wrongfully held by the defendant.

The jurisdiction of the district court was challenged by the defendant, but it was held the action was purely one to bring property into the estate and properly within the jurisdiction of the district court. (See, also, *In re Estate of Weaver*, 175 Kan. 284, 262 P. 2d 818.)

Contentions similar to those of the appellant were rejected in *Hurley v. Painter*, 180 Kan. 552, 306 P. 2d 184. The plaintiff brought a partition action against the defendant, who claimed title to the real estate by reason of an *inter vivos* gift coupled with delivery of possession. The plaintiff contended that inasmuch as record title to the real estate was in the decedent at the time of her death, the defendant's claim, if he had one, was against her estate and the district court had no jurisdiction to determine the defense. In rejecting this contention the court said this was a partition action and therefore covered by the code of civil procedure.

Here the administrator of the estate claims the defendant has certain property which should be in the estate. In defending against this action the defendant claims to be the owner of the securities in question because they had been given to her during the lifetime of the decedent—three years before his death. The defendant, therefore, has the right to defend the action and show why she is entitled to keep possession. In defending, she is not attempting to get anything out of the estate, but merely to keep what she contends was given to her before the decedent's death.

Was the evidence sufficient to establish a gift *inter vivos* to the defendant?

It is clear on appellate review that the Supreme Court does not determine the weight and credence to be given the oral testimony of the witnesses which is an exclusive function of the trier of the facts. (*Rupp v. Rupp*, 171 Kan. 357, 233 P. 2d 709.) The general finding made by the trier of the facts determines every controverted question of fact in support of which evidence has been introduced (*Manville v. Gronniger*, 182 Kan. 572, 322 P. 2d 789; and *Dryden v. Rogers*, 181 Kan. 154, 309 P. 2d 409), and a verdict or finding made by the trier of the facts and supported by evidence will not be disturbed on appeal (*Hillebrand v. Board of County Commissioners*, 180 Kan. 348, 304 P. 2d 517; and *Hale v. Ziegler*, 180 Kan. 249, 303 P. 2d 190).

The appellant is fully aware of the foregoing rules but takes the position that the facts in this case, concerning which there is

no controversy, establish as a matter of law that the decedent in the instant case did not make a valid gift *inter vivos.*

The elements necessary to establish a valid gift *inter vivos* of personal property are (1) an intention to make a gift; (2) a delivery by the donor to the donee; and (3) an acceptance by the donee. (*In re Estate of Baumstimler,* 159 Kan. 316, 153 P. 2d 927; and 24 Am. Jur., Gifts, § 22, p. 741.)

It is conceded by the appellant that cases touching upon gifts *inter vivos* of personal property are always "fact" cases. There cannot be any doubt that the elements of intent, delivery and acceptance are usually questions of fact to be determined by the jury. (*Hess v. Hartwig,* 83 Kan. 592, 112 Pac. 99; *Stevenson v. Hunter,* 131 Kan. 750, 293 Pac. 500; *Dewey v. Barnhouse,* 75 Kan 214, 88 Pac. 877; and *Barnhouse v. Dewey,* 83 Kan. 12, 109 Pac. 1081.)

The appellant attaches some importance to the fact that the record title of the securities in question was in the name of the decedent at the time of his death.

The instructions of the court informed the jury as follows:

"INSTRUCTION No. 10.

"You are instructed that in order to make a valid gift of corporate stocks, bonds or an insurance policy such as are the subject of this action, it is not necessary that there be an endorsement on the instruments or a written assignment thereof. It is necessary that there be an intention to make a gift by the person who is making it, and, in the absence of a written transfer or endorsement, an actual delivery of the instruments. There must also be an acceptance of the gift by the person receiving the same. A gift which is beneficial to their person receiving it is presumed to be accepted by such person unless such person is shown to have refused or rejected said gift.

"INSTRUCTION No. 11.

"A valid gift of personal property may be made even though the person making the gift retains the income from such property for himself for a period of time provided that the gift is absolute and irrevocable.

"INSTRUCTION No. 12.

"By delivery is meant the final and absolute transfer of the possession of personal property from one person to another whereby the one who gives the property relinquishes all dominion or control of such property and in such manner that it cannot be recalled by the one who gives.

"INSTRUCTION No. 13.

"You are further instructed that a gift of personal property is ordinarily not complete if the person making the gift retains possession. However, it does not defeat the gift if, after delivery of the items has been made the personal

property is returned to the person making the gift for safekeeping for the benefit of the person receiving the gift.

### "INSTRUCTION No. 14.

"You are further instructed that in order to make a valid gift of stocks, in a corporation, it is not necessary that there be a transfer of such stocks on the books of such corporation, provided the other elements of intent, delivery and acceptance are present as defined in these instructions."

Though some objection was made to certain of the above instructions at the trial, the motion for a new trial, as reflected by the abstract, does not assign as trial error the giving of the foregoing instructions. Furthermore, the appellant's specification of error on the submission of instructions to the jury has been abandoned in his brief. Under these circumstances, it must be presumed the foregoing instructions are correct, and they become the law of the case. (See, *Kitchen v. Lasley Co.*, 186 Kan. 24, 348 P. 2d 588; and *In re Estate of Cross*, 186 Kan. 590, 352 P. 2d 427.) For authorities concerning the law suggested by the instructions see *Culp v. Mulvane*, 66 Kan. 143, 71 Pac. 273; 38 C. J. S., Gifts, § 46, p. 826; *State v. Kuthy*, 71 N. E. 2d 133; *Bolles v. Trust Co.*, 132 O. S. 21, 4 N. E. 2d 917; Fletcher Cyclopedia Corporations, Vol. 12A, §§ 5683 to 5685 (transfer of corporate stocks); *Stepson v. Brand*, 213 Miss. 826, 58 So. 2d 18; 38 C. J. S., Gifts, § 53; p. 838; 24 Am. Jur., Gifts, § 70, p. 766; 47 A. L. R. 738 (transfer of insurance policies); *Ariett v. Osage County Bank*, 120 Kan. 286, 242 Pac. 1018; *Grant Trust, etc., Co. v. Tucker*, 49 Ind. App. 345, 96 N. E. 487; *Moore v. Brodrick*, 123 F. Supp. 108; and *Union National Bank v. Jessell*, 358 Mo. 467, 215 S. W. 2d 474 (transfer of government bonds).

The relationship of the parties is an important factor in determining the sufficiency of the evidence to sustain the finding of the jury that a valid *inter vivos* gift was made. Where the relationship of the parties is such that the donee has a natural claim on the generosity of the donor, the courts look with favor on the claim of gift and, generally speaking, less evidence is required to support a gift to a close relative than would be necessary to sustain one to a stranger. The rule favoring claims of gifts to persons having a natural call on the generosity of the donor finds frequent application where gifts are made by a parent to a child. (38 C. J. S., Gifts, § 67c, p. 882; *Schwindt v. Schwindt*, 61 Kan. 377, 59 Pac. 647; *Hess v. Hartwig*, 83 Kan. 592, 112 Pac. 99; and *Hurley v. Painter*, 180 Kan. 552, 306 P. 2d 184.)

The facts heretofore related disclose that the relationship between

the decedent and the defendant was equivalent to that of father and daughter. The manager of the apartment hotel where the decedent resided testified that the decedent was very talkative. He said the decedent hung around the desk quite often and talked of the defendant and her sister, but never mentioned Robert F. Hudson, who was a nephew, although both the decedent and his nephew were attorneys practicing law in the City of Wichita, Kansas. In fact, the manager testified he did not know the decedent had a nephew until his death. According to the manager's records, the defendant was to be notified in the event the decedent had any difficulty while living at the apartment hotel.

There is no question from the evidence that the defendant was virtually all the family the decedent had at the time the gift was made, and that the defendant was the natural object of his bounty. While these facts do not determine whether a valid gift was made, they have a definite bearing upon the sufficiency of the evidence to uphold the verdict of the jury on the matter of the decedent's intention to make a gift *inter vivos*.

The record discloses substantial evidence in corroboration of the intention of the decedent to make a gift to the defendant, and of the fact that he had made it. The evidence shows that the decedent would send the defendant the premium receipts on the insurance policy so she would know it was in force, and so she could take care of paying the premium herself if anything prevented him from doing so. After each payment of the insurance premium the receipt was sent to the defendant with a letter from the decedent.

Another witness, Mona Clemons, was a very close friend of the decedent and his wife, Gertrude. She testified that in the latter part of 1957 the decedent advised her of the possibility of saving death taxes by giving up to $3,000 annually, and $30,000 at one time, in property to her daughter. In relating these facts to the witness, the decedent stated he had given $30,000 worth of securities to his daughter, Marguerite (the defendant), because it would save death taxes.

At the time the bank box of the decedent was changed to a joint tenancy box with the defendant, the decedent also changed his checking account in the same manner and made it a joint tenancy account with the defendant. No checks were written on this account by the defendant during the lifetime of the decedent, but she closed the account after his death. The funds in this account were not claimed by the appellant.

The appellant challenges the gift in question primarily on the ground, and the appellant contends, that the decedent did not part with full dominion and control over the securities in question. It is therefore charged the gift was not absolute and irrevocable. (*Calvin v. Free*, 66 Kan. 466, 71 Pac. 823; and *Instructions No. 11 and No. 12.*)

The evidence is uncontradicted that the decedent in August, 1956, when he called the defendant and her husband to his office in Wichita, took the stock certificates, bonds and insurance policy from a manila envelope in his desk and described and discussed these securities when he manually handed them to the defendant. These securities were then given to the defendant subject to his right to retain the interest, dividends or other income so long as he lived. On this occasion the securities were accepted by the defendant, put into her handbag and retained by her. It is not denied that after this delivery to the defendant, the securities were later returned to the decedent who placed them in a bank box, owned jointly by the decedent and the defendant, and transferred the Kansas Gas and Electric Company and Kansas Power and Light Company stock, which had been standing in the name of himself and Gertrude Hudson jointly, to his own name. These facts, unexplained, would possibly have justified the jury in concluding that the decedent had not parted with full dominion over the property. However, the circumstances under which the decedent performed these acts were explained by other evidence which was sufficient to authorize the jury to find that such acts, performed by the decedent, were entirely consistent with a completed gift to the defendant at the time alleged.

The general rule is stated in 24 Am. Jur., Gifts, § 38, p. 752, as follows:

"It follows from the necessity for delivery that, generally, a gift *inter vivos* is not perfected if a donor retains control of the property. . . . However, the custody of property, after an alleged completed gift, is subject to explanation, since it may bear upon the question whether there has been an executed gift, retention of the gift not being necessarily incompatible with the donee's dominion of the property. For example, under some circumstances, when all the other requisites of a gift are present, the donor may, by declarations or otherwise, constitute himself a trustee of the property for the benefit of the donee, and in such case it is well settled that no further delivery is necessary . . ."

The foregoing is the law in Kansas. In *Hess v. Hartwig*, supra, Syllabus ¶ 2 reads:

"While a complete and unconditional delivery is essential to the validity of a gift, a constructive or symbolic delivery will meet the requirements of the law;

and where there is a delivery the fact that the property may be redelivered to the donor as agent or trustee of the donee, or for safe-keeping, will not nullify or affect the gift."

The same principle was discussed in *Stevenson v. Hunter*, 131 Kan. 750, 293 Pac. 500, where the donor retained the dividends until her death. In *Pohl v. Fulton*, 86 Kan. 14, 119 Pac. 716, it was held the requirement of delivery was satisfied by the donor creating himself a trustee of the gift for the benefit of the donee. Also, in *Barnhouse v. Dewey*, 83 Kan. 12, 109 Pac. 1081, the donor was held to be a trustee for the donee. (See, *Calvin v. Free*, supra.) Reference is made to *Ariett v. Osage County Bank*, 120 Kan. 286, 242 Pac. 1018, for careful study regarding gifts *inter vivos*, and for a discussion of the rules where the donor constitutes himself trustee for the benefit of the donee. The appellant relies upon this case but we do not regard the factual situation there presented as controlling in the instant case.

The appellant cites many cases in which he contends it was held the facts did not establish gifts *inter vivos*. (*Gallagher v. Donahy*, 65 Kan. 341, 69 Pac. 330; *Mahoney v. Martin*, 72 Kan. 406, 83 Pac. 982; *Barnhouse v. Dewey*, 83 Kan. 12, 109 Pac. 1081; *Billings v. Bishop*, 130 Kan. 453, 286 Pac. 221; *Knox v. El Dorado National Bank*, 137 Kan. 500, 21 P. 2d 353; *In re Estate of Brown*, 159 Kan. 408, 155 P. 2d 445; and *In re Estate of Boller*, 173 Kan. 30, 244 P. 2d 678.) The factual situations presented by these cases are readily distinguishable from the instant case, when the full context of these opinions is studied.

The appellant argues:

"The theory of the defendant in this case is that when she gave the securities back to the deceased, that she therefore constituted him as trustee for her. The question then arises in just what way was he trustee for the defendant? He had told her that he might sell the United States Government bonds and that he might also transfer the stocks so that *he* could receive the dividends thereon. For whose benefit was the trust established? Certainly not the defendant, as evidenced by the fact that at the date of the death of deceased, they (the stocks) had been transferred out of the names of the deceased and his wife and into the name of the deceased, solely. Therefore, if there was nothing to be done by the deceased in his capacity as trustee, then no trust resulted."

The evidence in this case is sufficient to establish that actual delivery was completed literally and accepted by the defendant. There is substantial evidence of intention to make a gift and the act of completing it. Subsequently, there is evidence that the securities were redelivered to the donor for the purpose of being held in safe-

keeping for the donee and to further enable the donor to make some changes in the record title of the securities, pursuant to an agreement with the donee, to enable the donor to enjoy the life income which he reserved without inconveniencing the donee. This is not inconsistent with the completion of the gift, and on appropriate instructions the case was submitted to the jury for its determination.

It is not the contention of the appellee that the gift was made by depositing the securities in the joint safety deposit box, but that it was made in the office of the decedent upon delivery of the securities. The establishment of a joint safety deposit box merely corroborates the fact that the gift was made and reveals that possession of the securities by the decedent was not for his benefit alone, but for the benefit of the defendant.

Analyzed in terms of the duties of the decedent as trustee, it must be recognized that the gift to the defendant was a capital gift only, and not a gift of the income which was reserved by the donor. The duty of the donor as trustee, therefore, was to hold the corpus of the trust intact for the donee until the death of the donor, without invasion or dissipation of the corpus by the donor for the remainder of his life. The power of the donor, pursuant to an agreement with the donee, to change the record title of these securities, to facilitate his collection of the life income reserved for himself, and for the convenience of the donee, does not alter the donor's obligation as trustee to hold the corpus of the trust intact for the donee.

The retention of the income does not affect the validity of a gift. (*Stevenson v. Hunter*, 131 Kan. 750, 293 Pac. 500; 38 C. J. S., Gifts, § 38, p. 817; Fletcher Cyclopedia Corporations, Vol. 12A, § 5683, *et seq.*; and instruction No. 11.)

It has been held that where a deed is effectively delivered the fact that it is handed back to the grantor for some purpose does not affect the delivery. (*Stump v. Smarsh*, 153 Kan. 804, 113 P. 2d 1058; *Cole, Administrator v. Hoefflin*, 187 Kan. 66, 354 P. 2d 362; see, also, *Reed v. Keatley*, 187 Kan. 273, 356 P. 2d 1004.)

We hold the evidence in the instant case was sufficient to sustain the finding of the jury that the decedent made a valid *inter vivos* gift of the stocks, bonds and insurance policy in question to the defendant.

The appellant contends the trial court should have sustained his motion for a new trial on the ground of newly discovered evidence.

The newly discovered evidence was introduced at the hearing on the motion for a new trial and consists of the testimony of LeRoy McAdam, the officer in charge of the safety deposit boxes at the Fourth National Bank, who has testified during the course of the trial. Nothing is indicated by this proposed evidence to show that the verdict of the jury was wrong in whole or in some material part. (G. S. 1949, 60-3004.) Furthermore, with reasonable diligence this newly discovered evidence could have been discovered and produced at the trial. (G. S. 1949, 60-3001, *Fifth*.) The appellant's point that he is entitled to a new trial on the ground of newly discovered evidence is therefore not well taken.

The judgment of the lower court is affirmed.

WERTZ, J., not participating.